UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

_____ )
)
GREGORIO TREVINO, JR.; JUAN )
CARLOS "J.C." CARDENAS; GEORGE )
"DOC" ENRIQUEZ; GUADALUPE )
"LUPE" GARCIA; RENE MARTINEZ )
HERRERA; LUCAS O'BRIEN RUIZ; and )
SANTIAGO ZAVALA, )
    Plaintiffs, )
)
v. ) Civil Case No. 15-CV-435
)
HIDALGO COUNTY, TEXAS; ) DECLARATORY AND INJUNCTIVE
A.C. CUELLAR, in his official ) RELIEF SOUGHT
capacity as Commissioner of Precinct One, )
Hidalgo County, Tex., and in his personal )
Capacity; RAUL LOZANO; DAVID )
RODRIGUEZ; OSCAR GARCIA; OSCAR )
GONZALEZ; and ESTEBAN MATA, in )
their official and personal capacities, )
    Defendants. )
_____)

**Plaintiffs' Second Amended Complaint**

  Plaintiffs GREGORIO TREVINO, JR., JUAN CARLOS "J.C." CARDENAS, GEORGE

"DOC" ENRIQUEZ, GUADALUPE "LUPE" GARCIA, RENE MARTINEZ HERRERA,

LUCAS O'BRIEN RUIZ and SANTIAGO ZAVALA bring this action for injunctive and

declaratory relief, as well as nominal and compensatory damages and punitive damages, and

complain as follows:

**JURISDICTION AND VENUE**

  1.  This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343.

This civil action arises under the First and Fourteenth Amendments of the United States

Constitution and 42 U.S.C. § 1983, 1985.  Plaintiff seeks a declaration of his rights in this case of actual controversy within this court's jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

2.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this claim occurred in this district.

## PARTIES

3.      Plaintiffs are all residents of Hidalgo County, Texas.

4.      Defendant Hidalgo County, Texas is a governmental entity established under the laws of Texas and can be served by delivering citation to its county judge, Ramon Garcia, at 100 E. Cano St., Edinburg, TX 78539.

5.      Defendant A.C. Cuellar is the Precinct One Commissioner and can be served by delivering citation to him at 1902 Joe Stephens Avenue, Ste. 101, Weslaco, Hidalgo County, Texas.

6.      Raul Lozano, chief of staff to Defendant Cuellar during all relevant times, resides in Hidalgo County, Texas.  Lozano plays a key role in implementing Cuellar's political retaliation by harassing targeted Precinct One employees and running them off the job.  Lozano frequently gave orders to Precinct One employees under his supervision—including especially the other defendants here—to carry out harassment and illegal retaliation against Plaintiff and other Precinct One employees who failed to support Cuellar's political preferences.

7.      David Rodriguez, a high level employee under Defendant Cuellar during all relevant times, resides in Hidalgo County, Texas.  Rodriguez plays a key role in implementing Cuellar's political retaliation by harassing targeted Precinct One employees and running them off the job.  Rodriguez frequently gave orders to Precinct One employees under his supervision—

including especially the other defendants here—to carry out harassment and illegal retaliation against Plaintiff and other Precinct One employees who failed to support Cuellar's political preferences.

8.      Oscar Garcia, a high level employee under Defendant Cuellar during all relevant times, resides in Hidalgo County, Texas.  Oscar Garcia plays a key role in implementing Cuellar's political retaliation by harassing targeted Precinct One employees and running them off the job. Oscar Garcia worked at the City of Weslaco but when Cuellar took office, Cuellar brought Oscar Garcia to Precinct One.

9.      Oscar Gonzalez, a high level employee under Defendant Cuellar during all relevant times, resides in Hidalgo County, Texas.  Oscar Gonzalez plays a key role in implementing Cuellar's political retaliation by harassing targeted Precinct One employees and running them off the job.  Oscar Gonzalez in effect took over the role played by Oscar Garcia after Oscar Garcia left Precinct One.

10.     Esteban Mata, a high level employee under Defendant Cuellar during all relevant times, resides in Hidalgo County, Texas.  Mata plays a key role in implementing Cuellar's political retaliation by harassing targeted Precinct One employees and running them off the job.

### STATEMENT OF FACTS

### Guadalupe "Lupe" Garcia

11.     Plaintiff Guadalupe "Lupe" Garcia's (hereinafter "Lupe Garcia") story proceeds in two parts.  Lupe Garcia initially aligned himself politically with A.C. Cuellar and was rewarded with favorable treatment so long as he assisted in carrying out Cuellar's orders to harass and retaliate against Precinct One employees who were not on A.C. Cuellar's political team or did not follow Cuellar's wishes regarding other local elections.  However, when it became clear, first in

late 2013, that Lupe Garcia refused to support certain candidates favored by Cuellar, Lupe Garcia found himself the subject of retaliation and eventually constructively discharged.

**Lupe Garcia, Part One**

12.     Lupe Garcia is a long-time resident of Hidalgo County and runs a small tire shop business.  He has a significant number of friends and acquaintances through his family and through the tire shop.  In the world of Hidalgo County politics, this translates into influence with many potential voters.

13.     In early 2012, in addition to maintaining his interest in the tire shop, Lupe Garcia was employed as Parks Director for the City of Weslaco.

14.     Around this time Lupe Garcia discussed A.C. Cuellar's campaign with Cuellar and indicated that he wanted to support Cuellar.  Cuellar told Garcia to be patient and stay on with the City of Weslaco for now, but that if A.C. Cuellar were to win and assume office, he would make him the Parks Director for Precinct One with a salary in excess of $50,000.  Cuellar said to be patient in the meantime, and that Cuellar would arrange for Garcia to receive a raise from the City of Weslaco.

15.     Lupe Garcia did in fact receive a raise from Weslaco after this conversation, which Garcia believes resulted from A.C. Cuellar's influence.

16.     Lupe Garcia continued his employment with Weslaco for about three months after his conversation with A.C. Cuellar, but resigned after he was unable to secure a further raise from the Weslaco city manager.

17.     Thus, beginning in mid-2012, Lupe Garcia spent about six months working at his tire shop and assisting the A.C. Cuellar campaign.

18.     As one example of Lupe Garcia's support during the campaign, Garcia hosted a "pachanga" for A.C. Cuellar's campaign featuring brisket and live music and attendance by many voters.  Lupe Garcia would also campaign for Cuellar at the polling location.

19.     One day at the polling location, Lupe Garcia was standing under the Cuellar campaign tent when Plaintiff Pedro "Pete" Garcia, Jr. walked by.  Defendant Oscar Garcia saw Pete and remarked to Lupe Garcia that he "hated that guy" and "we are going to get rid of him."

20.     After Cuellar took office in January 2013, Lupe Garcia was hired at Precinct One around March 2013.  His initial title was Construction Inspector.

21.     At the time, Defendant Oscar Garcia was Director of Field Operations, with authority over all field operations under Precinct One, including the Sanitation, Road and Bridge, and Parks departments.

22.     Oscar Garcia told Lupe Garcia that if Lupe Garcia wanted the Parks Director job that had been promised by A.C. Cuellar, then he would have to find a way to get rid of Plaintiff Pete Garcia, who had the job at that time.  Oscar Garcia said of Pete Garcia, "he was supporting Quintanilla, now he's sitting pretty here," or words to that effect.  Oscar Garcia told Lupe Garcia "we brought you in, now you have a job to do," and "You want that job, go pressure him," or words to that effect.

23.     Oscar Garcia also instructed Lupe Garcia to target additional individuals known to have supported A.C. Cuellar's opponent Quintanilla in the preceding campaign, including Plaintiffs Greg Trevino, Jr., Santiago Zavala, J.C. Cardenas, George "Doc" Enriquez, and others.

24.     Oscar Garcia would constantly push Lupe Garcia to harass Pete Garcia, Santiago Zavala, and the others, to get rid of them.  Oscar Garcia would make such statements almost every other day.

25.     At some point in mid-2013, A.C. Cuellar divided the Parks Department into two zones of authority, with Plaintiff Pete Garcia relegated to the North parks and Lupe Garcia given authority over the South parks.

26.     Defendant Oscar Garcia instructed Lupe Garcia to take Pete Garcia's truck from him.  Lupe Garcia asked what authority he had to do that.  Defendant Oscar Garcia simply responded that if Pete had a problem, to tell Pete to call Oscar Garcia.  Defendant Oscar Garcia further instructed Lupe Garcia to go to Delta Lake Park (where Pete was stationed) and take the best tractor, weedeater, trucks, and other equipment for Lupe Garcia's use, so that Pete Garcia would look bad with only bad equipment.  During this and other conversations, Oscar Garcia would repeat that they needed to get rid of Pete because Pete was a Quintanilla supporter, and that they had not forgotten that Lupe Garcia had supported Cuellar's campaign.

27.     Later, Defendant David Rodriguez replaced Oscar Garcia.

28.     David Rodriguez told Lupe Garcia that he (Rodriguez) was pressured by Raul Lozano to get rid of Pete Garcia.  Lupe Garcia suggested that he could put Pete Garcia on labor work at the sheriff substation.

29.     Defendant Raul Lozano was present for several of the meetings Lupe Garcia had with David Rodriguez and/or Oscar Garcia, at which Lupe Garcia was pressured to run the targeted employees off the job.  Raul Lozano said several different times at these meetings that "the Commissioner [referring to A.C. Cuellar] wants us to move on this," referring especially to running Pete Garcia off.

30.     The constant pressure on Pete Garcia, Santiago Zavala, and the others continued. Other supervisors, in addition to Lupe Garcia, were instructed to pressure Pete Garcia, Santiago Zavala, and others to quit in retaliation for their political association and speech activities.

31.     In the hotly contested November 2013 elections for the City of Weslaco Commission, A.C. Cuellar supported Weslaco Commissioners Joe Martinez (over challenger Fidel Pena) and Guadalupe "Lupe" Rivera (over challenger Leticia Lopez).

32.     Defendant David Rodriguez instructed Lupe Garcia to invite Santiago Zavala, Joe Burgos, and certain other county employees to a campaign event at Rolando Guerra's house because David Rodriguez "want[ed] to see if they will be loyal to this Commission," referring to the Weslaco commissioner candidates supported by A.C. Cuellar.  Lupe Garcia invited Santiago Zavala, Joe Burgos, and others, as instructed.

33.     Lupe Garcia attended the campaign function at Rolando Guerra's house. A.C. Cuellar attended, gave a speech and endorsed Commissioners Joe Martinez and Lupe Rivera for re-election.

34.     At one point during the party, Lupe Garcia was present when Weslaco Commissioner Joe Martinez asked A.C. Cuellar about Pete Garcia's continued employment at Precinct One.  Cuellar responded, "Yea, I already told him [Lupe Garcia] that if he wants that job he needs to help me get rid of Pete."

35.     Neither Santiago Zavala nor Joe Burgos showed up at the party.

36.     Afterwards, referring to who had failed to show up, David Rodriguez remarked to Lupe Garcia that "now we know who's loyal to us, if you're not loyal you're going to get what's coming."

**Lupe Garcia, Part Two: The Tables Turn**

37.     The tables began to turn regarding Lupe Garcia after an encounter with A.C. Cuellar during early voting before the November 2013 elections.

38.     Lupe Garcia was driving his county truck returning from one of the parks in Donna. As he was driving on the south-side Expressway 83 frontage road, he received a phone call from A.C. Cuellar.  Cuellar was driving his personal vehicle behind Garcia and had seen Garcia in the county truck.  Cuellar pulled up next to Garcia in the adjoining lane, rolled down his window and initiated a conversation.  Although this was during working hours, Cuellar asked, "What are you doing at work?"  Garcia responded that he was working.  Cuellar replied "there's a campaign going on."  Garcia said that he did not want to get docked for time if he were to be away from work (because at this time David Rodriguez was not as friendly with Garcia).

39.     Cuellar instructed Garcia to take the rest of the week off work because Cuellar needed Lupe Garcia and Jerry Tafolla to help him campaign for the Weslaco candidates (Lupe Rivera for Commissioner Dist. 5 and Adrian Farias for mayor).

40.     Lupe Garcia said that he is fine helping with Lupe Rivera's reelection, but that he does not want to get involved in the mayor's race.  Cuellar was very surprised, and said "what do you mean, I'm helping Farias out big time."

41.     Lupe Garcia did take off work that week as instructed by Cuellar and helped with campaigning for Lupe Rivera, block walking and passing out fliers in District 5 during early voting.  But Garcia did not lend his support for Farias for mayor.

42.     Soon after this, on or about January 3, 2014, Defendant David Rodriguez called Lupe Garcia into a meeting where Esteban Mata and Oscar Garcia were also present.  Rodriguez informed Lupe Garcia that he would no longer be the parks supervisor, would have no crew, no truck, and would have to go to work with a crew as a laborer.  Rodriguez informed him that Leonel Oliviera would be assuming the Parks Director position.

43.     Lupe Garcia asked why, and Rodriguez said it was a decision that he, Mata and Oscar Garcia had all discussed.  Rodriguez stated that the three of them had "talked it over and we feel that's the person [Leonel Oliveira] who can do a better job.  You're going to be an assistant and work closely with Leonel."

44.     Lupe Garcia asked for something in writing documenting the transfer, but they had nothing in writing.

45.     Contrary to Rodriguez's claim of a joint decision, after this meeting, Lupe Garcia talked to Mata and Oscar Garcia.  Both of them stated that they had no notice of the change before that meeting.

46.     Following removal from his position as Parks Director, Lupe Garcia was assigned a series of progressively worse transfers designed to force him out of Precinct One.

47.     First, for about six months or so (January to approximately August), Lupe Garcia was under the supervision of Leonel Oliveira and tasked with manual labor, mainly weedeating at the parks.

48.     Lupe Garcia got sick and went to the hospital around this time for diverticulitis.  He stayed approximately eight days in the hospital.

49.     Upon returning to work, Garcia asked Esteban Mata for lighter duty due to his condition.  Instead, Mata tasked him with tree trimming, which was consistently heavier duty manual labor than his previous tasks, mainly weed-eating. Garcia complained to Mata that the work was causing pain due to his condition, but Garcia's duties remained the same for approximately six weeks.

50.     While Lupe Garcia was tasked with the tree-trimming duties, another incident happened after which A.C. Cuellar and the other Defendants became aware that Garcia did not

support their favored slate for Weslaco school board elections that were upcoming in November 2014.

51.    It was common knowledge that Defendant A.C. Cuellar supported the following slate for Weslaco school board in November 2014: Rene Arce (Place 4); Robert Sepulveda (Place 5); Ana Dalia Oliveira (Place 6); and Jeff Everitt (Place 7).

52.    But Lupe Garcia supported all of their opponents, as follows: David Fuentes (Place 4); Andrew Gonzalez (Place 5); Oscar Caballero (Place 6); Isidoro Nieto (Place 7). Lupe Garcia supported this slate because he knew them all and because they were better qualified for the job.

53.    Lupe Garcia had picked up a Caballero campaign magnet at a Caballero event and placed it on his truck. He forgot to remove it before driving in to work and parking his truck at the employee lot at Precinct One. Defendants A.C. Cuellar and others were offended that Garcia was not supporting their preferred slate, and retaliated against him.

54.    Lupe Garcia was again transferred to an even more arduous job with the illegal dumping crew. This required constant heavy lifting, including sofas and tires, which had to be thrown over the side of a trailer. Some days Garcia was supposed to pick up in the range of 60 tires. Sometimes the tires were filled with water, making them heavier to lift.

55.    All of this constant heavy lifting had Garcia in pain every day after work. The pain was too much to bear. Garcia was already ignoring his doctor's orders to take it easier because Garcia had to work to provide for his family.

56.    The strain and constant harassment were such that any reasonable person would have felt compelled to resign.

57.    Lupe Garcia did resign about four to six weeks after joining the illegal dumping crew, in or about late September or October 2014.

### Gregorio "Greg" Trevino, Jr.

58.     Plaintiff is a long-time resident of Hidalgo County.  He is married and has seven children.  All of his children were ages twelve and under at the relevant times.  Plaintiff had breast cancer.  Defendants were aware of all these facts.

59.     Trevino was employed under Precinct One from approximately 2003 to 2006, when he changed employment to Edcouch Elsa ISD.

60.     Trevino publicly supported Joel Quintanilla for Precinct One Commissioner in a special election held in 2010. Defendant A.C. Cuellar ran as a write-in candidate against Quintanilla in that election.  Quintanilla won and took office.

61.     Trevino began working for Precinct One again on September 26, 2011 in the maintenance department.

62.     Precinct One Commissioner was on the general election ballot again in 2012 for a full term.  Joel Quintanilla ran as the incumbent against A.C. Cuellar.  Trevino again supported Quintanilla.  Defendant Cuellar won the election.

63.     Upon taking office, Defendant Cuellar began a systematic campaign of retaliation against many persons who had supported Quintanilla and/or whom were otherwise not willing to go along with the political preferences in other local elections of Defendant Cuellar.  Plaintiff Trevino was subjected to various forms of unconstitutional and retaliatory conduct that eventually culminated with his termination.

64.     After Defendant Cuellar took office, Jose Lupe Garcia, as well as Defendants and other agents of Defendants, told Trevino that Cuellar wanted Trevino to be on Cuellar's political team.

65.     Trevino was afraid for his job, which he needed to support his family with seven young children.  Trevino had distributed many large campaign signs for Quintanilla in 2010 and 2012.  Trevino still maintained these signs after Cuellar took office, and he showed the signs to Jose Lupe Garcia because Trevino was afraid for his job and he wanted A.C. Cuellar's team to think that Trevino could help with the Cuellar campaign.

66.     Lupe Garcia, among other Defendants and other agents of Defendants, on behalf of A.C. Cuellar, told Trevino that they were going to take care of him and other Precinct One employees, that is that Trevino and the other employees would not be fired or harmed in their jobs, if they helped support the political candidates supported by A.C. Cuellar.

67.     While early on Trevino at times had attempted to placate Cuellar and his regime in order to keep his job, Trevino had always planned to support his preferred slate for Edcouch-Elsa ISD elections in November 2013, among other candidates of his own choice.  Trevino supported the "Team Unity" slate, but Defendants supported "Edcouch First."   Defendants ultimately terminated Trevino because he was helping Eddy Gonzalez and Danny Guzman of Team Unity, among other candidates other than the candidates supported by Defendants.

68.     Plaintiff Trevino was singled out for harassment and retaliation because he supported candidates of his choice rather than candidates preferred by Cuellar.  On one occasion, Defendant Oscar Garcia forced Trevino to leave work to purchase a different type of boots or he would be fired, whereas two other employees were allowed to simply bring the correct footwear the next day.

69.     On October 17, 2013, Trevino requested a leave from October 21 – November 2, 2013.  He was directed by a county employee that it would have to be leave without pay, and that

he must make his request directly to A.C. Cuellar in writing, which Trevino did on October 18, 2013.  Trevino's request for leave without pay was denied by letter dated October 18, 2013.

70.     By letter dated October 23, 2013 which was delivered to Plaintiff later, Trevino learned that Precinct One considered his employment terminated effective October 23.  The letter stated that Trevino had "automatic[ally] resign[ed]" by his "failure to report to work as scheduled."  In actuality, Trevino was targeted for termination because of his political activities that ran contrary to the whims of Defendants.

71.     Plaintiff was well known to be a supporter of Gonzalez and Guzman, and other political candidates opposed by Defendants, and Defendants did not appreciate that fact.  Defendants repeatedly communicated to Trevino that he needed to switch teams, that A.C. Cuellar wanted him to be on their team, and if he worked with their political team, his job at Precinct One would be safe and free of harassment.

72.     Plaintiff does not like people trying to dictate to him how he should vote or participate in politics.  Therefore, despite warnings from his government employers and superiors, he continued to publicly support the candidates of his choice for Edcouch Elsa school board and other public offices.

73.     Defendants' claim that Trevino abandoned his job is pretextual; in actuality, Defendants terminated Plaintiff on account of his political activities.  Trevino never would have abandoned his job, especially considering that he had seven children, all under the age of twelve at the time in question, that Trevino was in treatment for stage II breast cancer, and that he needed to maintain his insurance policy for his family and his own medical care.

74.     Defendants' actions, severally and jointly, violated Plaintiff's civil rights guaranteed under the laws of the United States of America and Texas, and Plaintiff thereby sues for relief and to regain the reputation and dignity harmed by the Defendants' illegal actions.

### George "Doc" Enriquez

75.     George "Doc" Enriquez ("Enriquez") holds a commercial drivers' license and was employed by Hidalgo County Precinct One as a truck driver under Commissioners Sylvia Handy and also under Commissioner Quintanilla, immediately before Defendant Cuellar took office.

76.     Enriquez supported Quintanilla in his campaigns against Defendant Cuellar, and this fact was well known around Precinct One.

77.     Soon after A.C. Cuellar assumed office in January 2013, Enriquez was transferred from the truck driving position to Delta Lake Park on the weedeater for approximately a month.

78.     Then, in approximately February, Enriquez was transferred to the Sanitation Department with the illegal dumping crew.  His supervisor was Rick Medrano.

79.     The illegal dumping crew involves heavy lifting outside in the severe heat.

80.     While at Sanitation, Enriquez was constantly moved around to various jobs seemingly randomly, including sometimes to work with the patch crew.

81.     Enriquez requested a meeting with his supervisor at Sanitation, Rick Medrano, and asked for a job driving a truck, even if it were a sanitation truck, for a few days a week, since Enriquez is a certified commercial truck driver.

82.     The next day, Medrano said he spoke to David Rodriguez but Rodriguez said he could not help Enriquez out because Enriquez had not supported Cuellar's campaign.  Medrano said "Really I am going to tell you straight, I can't help you out because you didn't help us out."

Medrano said that they had already told him what kind of work to assign to Enriquez and not to let Enriquez work in a truck.

83.     On August 20, 2014, Enriquez was engaged in a conversation with other Precinct One employees, including Joe Contreras and Lupe Garcia. Enriquez explained the he was constantly being moved around and tasked with jobs like picking up trash and working on the patch crew despite his commercial drivers' license. Enriquez stated that the supervisors would not let him work as a driver. Enriquez also made the comment that Cuellar would be out of office within a few years.

84.     Joe Contreras filed a vague written complaint with Human Resources reporting that Enriquez had made political comments about how Cuellar would lose the office in a few years. Joe Contreras was (and remains) a Commissioner in La Villa, a municipality within Precinct One. As such, Contreras has political pull in that area that can benefit Defendant Cuellar. Contreras signed the statement with three others signing as witnesses.

85.     Lupe Garcia refused to sign the letter because he did not believe the version claimed by Contreras was true. Lupe Garcia signed his own statement on August 26, 2014.

86.     On August 21, 2014, Enriquez overheard a conversation on the county two-way radio in which Joe Contreras was having trouble backing up a large truck on a job site. Another Precinct One employee was trying to instruct Contreras as to how to back up the truck. Enriquez picked up the radio and said, "If you can't do it just bring somebody who can do the job," or words to that effect.

87.     Five days later, in a letter dated August 26, 2014 and signed by Defendant Esteban Mata, Cuellar's office notified Enriquez that he was terminated. The letter claims that Enriquez was in violation of the Hidalgo County Civil Service Commission Rules. The letter cites the

August 20 conversation and complaint by Joe Contreras, but the termination letter is not supported by even Contreras's own written complaint.  The letter also claims that Enriquez made derogatory comments over the radio, but the statement claimed in the letter was apparently fabricated, because Enriquez did not make the statement claimed in the letter.

### Santiago Zavala

88.     When A.C. Cuellar assumed office in 2013, Plaintiff Santiago Zavala had already accumulated thirteen years of service to Hidalgo County, and had served eight years as parks department foreman.  Zavala had started as a receptionist in the Maintenance Department and worked his way up to Maintenance 11, and then the promotion to parks foreman.  He had an impeccable personnel record at Hidalgo County.

89.     Zavala took great pride in his work and keeping his tools inventoried and organized.

90.     It was well known that Zavala would not lend political support to A.C. Cuellar or his preferred candidates in other races.

91.     On or about July 2, 2013, Zavala was summoned to a meeting with Defendant David Rodriguez.  Rodriguez requested that Zavala agree to reclassify his job assignment as Maintenance III, which is more of a laborer position, and that he would lose his truck and supervisory role.

92.     Zavala refused to sign the document without his union representative present.

93.     Although Lupe Garcia at the time had begun as Construction Inspector, Zavala was constantly harassed and pressured by Lupe Garcia.

94.     On or about August 13, 2013, Zavala requested a meeting with David Rodriguez to report the harassment from Lupe Garcia.  Zavala met with Rodriguez and reported the harassment.

95.     Zavala also reported in that meeting that tools and equipment were missing from Delta Lake Park which other departments had borrowed and not returned.  Curiously, Defendant Rodriguez responded that "it's time to forget about Delta Lake Park and don't worry about anything that is happening in the park anymore."  Rodriguez stated that Lupe Garcia was not in charge, because A.C. Cuellar wanted it that way.  Rodriguez also instructed Zavala that if they assigned him to weedeat or pick up trash, to just do it and not say anything at all.

96.     Zavala was disturbed by this, because as Parks Foreman for eight years he had taken great care to keep track of his equipment and took pride in his work.

97.     In or about September 2013, Zavala was transferred to Road and Bridge.

98.     Later, after the New Year in 2014, Zavala was transferred to the Road and Bridge patch crew.

99.     Zavala suffered a knee injury on the job on April 11, 2014, and sought medical treatment.  He was placed on workers compensation in May, and had surgery for the injury in July.

100.     Zavala reported the harassment and these incidents to Miguel Saldana, the union representative, but nothing came of it.

101.     Zavala was terminated by letter dated September 4, 2014.  The letter claims that there was a "business necessity" to fill his position and that he had accordingly been administratively terminated.  This is pretextual.  Zavala was terminated as political retaliation for not supporting A.C. Cuellar or his preferred candidates politically.

**Juan Carlos "J.C." Cardenas**

102.     Plaintiff Juan Carlos "J.C." Cardenas ("Cardenas") has a long history of employment with Precinct One.  He started in 2001 and was by 2003 promoted to the Assistant

Director of the GED Program.  In 2005 he was hired as Precinct One staff, working as Call Center Manager for a salary of $55,000.

103.    When Defendant Cuellar assumed office temporarily in 2009, Cardenas was one of several county employees terminated.

104.    In 2011 he was reinstated under Commissioner Quintanilla as Community Liaison with a salary of $51,500.

105.    Soon after Cuellar assumed office again, in April 2013, Cardenas was transferred to Delta Lake Park to assist Plaintiff Pete Garcia with office management.  This was an office job that involved mainly menial clerical work.

106.    In August 2013, Cardenas was transferred again, to the Sanitation Department. Duties primarily included writing permits at the refuse sites where constituents deposit waste. Cardenas was also tasked with picking up trash around the sites.  This work was primarily outside.

107.    On March 30, 2014, Cardenas was again transferred, this time to the Road and Bridge Department patch crew.  This job requires intense physical labor, outside working with hot tar in the sun with no covering.  The patch crew is considered the hardest and filthiest department in the County.  It is objectively worse than his previous assignment to the Sanitation Department.

108.    The patch crew is where A.C. Cuellar sends employees as punishment for not supporting him politically.  There are other individuals who have been similarly punished, aside from Cardenas and other plaintiffs here, in political retaliation.

109.    Before Lupe Garcia fell out of favor with A.C. Cuellar for his political association, Garcia was frequently called in to David Rodriguez's office when Lupe Garcia was around the administrative offices.  Rodriguez would call Garcia in to his office to laugh at Cardenas.

Rodriguez would remark, "Did you hear where we put J.C. now, hopefully he'll leave," laughing. David Rodriguez made such comments regularly when he saw Lupe Garcia in the office.

110.    Cardenas remains working with the patch crew, but still retains his title of Community Liaison.  He is the oldest person on the patch crew, having turned 57 in November 2015.

### Lucas O'Brien Ruiz

111.    Plaintiff Lucas Ruiz ("Ruiz") is the son of Ruth Ruiz, an alderwoman for the City of Edcouch.  Ruth Ruiz and the Ruiz family were opposed to the Edcouch slate supported by A.C. Cuellar.

112.    Ruiz had been working since approximately mid-2012 in the mechanics shop at Precinct One.  This was primarily an office job where Ruiz was responsible for data entry, fuel logs, and orders for gasoline.

113.    When Defendant Cuellar assumed office, Ruiz was an immediate target due to the fact that his mother and family were opposed to Cuellar's political slate in Edcouch.

114.    About Aril 2013, Ruiz was transferred to the illegal dumping crew.  He also was sometimes sent to work with the patch crew.

115.    Alfonso Torres was the patch crew supervisor who had been brought in by A.C. Cuellar.  Torres would repeatedly ask Ruiz why he did not just quit if he were with the other political party.

116.    Supervisors constantly changed Ruiz's worksite at the last minute in an attempt to make him late for work, so that they could have something to fire him for.

117.    Later, Ruiz was transferred again to Delta Lake Park under the supervision of Leonel Oliveira, who had been instructed to make work as hard as possible on Ruiz in order to make Ruiz quit.

118.    One tactic Oliveira used was to deny Ruiz the use of convenient tools that would have made jobs easier.  One day, Oliveira instructed Ruiz to dig by hand.  Ruiz asked to use a nearby tractor for the job.  Oliveira refused.  Ruiz told Oliveira that he knew Oliveira was trying to make it hard on Ruiz because he was not a political supporter.

119.    In another incident, David Rodriguez instructed Ruiz to spend a whole week cleaning restrooms.  Rodriguez stated that Ruiz should report to him despite the fact that Ruiz's actual supervisor was supposed to be Rick Medrano in Sanitation.  Rodriguez did this to bully and embarrass Ruiz.

120.    Ruiz would get harassed or written up for seeking time off, despite the fact that other employees who had been brought in by Cuellar and had been Cuellar supporters in the election were not harassed and received significant time off for election activities.

121.    Several times, Defendant Oscar Garcia would ask Ruiz why he did not just quit if Ruiz was not supportive of Cuellar's candidacy or with the other political party in Edcouch.

122.    Ruiz was terminated on or about August 14, 2014.

123.    Defendants claim Ruiz was terminated for showing up to work late; this is a pretext. Ruiz was terminated because of his political association with candidates opposed by Defendant Cuellar.

### Rene Martinez Herrera

124.    Plaintiff Rene Martinez Herrera is a Precinct One employee.

125.    Martinez worked for a time under the supervision of Defendant Esteban Mata. Martinez worked at Delta Lake Park for a time, but was sent briefly to the Hargil collection site by Mata.  Once Martinez got the Hargil site in order, Mata had told him that Mata "had problems" at Delta Lake Park and wanted him to return.  Martinez was irritated at this chain of events, but agreed to return to help at Delta Lake Park.

126.    In the March 2016 primary election, Defendant A.C. Cuellar was aggressively challenged by David Fuentes.

127.    Martinez resides with his wife Josefina Martinez in a home that is directly across the street from the Monte Alto polling location that was used in the March 2016 primary.

128.    Defendant Mata was not only Martinez's supervisor at Precinct One, but also a neighbor.

129.    As the March 2016 primary approached, Mata's wife Irene Mata approached Martinez's home three or four times.  Martinez did not go to the door because he was irritated by his treatment at work by Esteban.  However, Irene spoke with Martinez's wife, Josefina, and asked if Martinez would allow the Cuellar campaign to place signs in his yard.  Josefina responded that Martinez had said it was fine.

130.    The Matas also requested that Martinez actively oppose the Fuentes campaign in specific ways.  They demanded that he refuse to allow Fuentes' campaign to put any signs in his yard.  They also demanded that he get up at 5 a.m. on primary election day to prevent any Fuentes supporters from parking on the narrow street in front of the polling place.

131.    Three or four days before primary election day, Defendant Cuellar himself—Martinez's employer—showed up on Martinez's doorstep.  Cuellar demanded to know why his

campaign signs were not displayed in Martinez's yard.  Martinez replied that he had already said that Cuellar's campaign could put the signs up.

132.    While he did not say as much to his boss when he appeared at his doorstep, by this time, Martinez had already decided to support Fuentes for Precinct One commissioner, and that he would not be following Cuellar's demands to refuse Fuentes signs or to get up early and tell Fuentes supporters they cannot park on the public street in front of his house.

133.    When Martinez woke up on Election Day, he noticed that all the Fuentes signs in his yard had been pulled up and thrown on the ground.  Martinez placed them back so they were properly displayed, because he supported Fuentes.

134.    Martinez and his wife then walked across the street to vote.  They saw Esteban and Irene Mata and waved, but the Matas appeared displeased and did not return the greeting.  This was a Tuesday.

135.    The following Monday, Mata told Martinez that Defendant David Rodriguez wanted to speak with Martinez in the main office.  This was at approximately 11:00 a.m.

136.    Martinez went directly to the main office without eating lunch.  He sat there for hours, until finally, around 2 p.m., Rodriguez noticed him and asked why he was there.

137.    Martinez said that Mata told him that David Rodriguez wanted to talk to him. Rodriguez responded: "Yo?"  Rodriguez appeared confused and said that he had not asked Martinez to come in.

138.    Rodriguez called Mata, then returned and said "now I remember, we decided we need you on patch crew," or words to that effect.  Martinez has been assigned to the patch crew ever since.

139.     Martinez's previous assignment at Delta Lake Park was conveniently only five minutes from his home.  Martinez had informed Leonel Oliviera that it was important for him to be close to home because he checks on his wife at home during lunch.  The patch crew meets at a park that is 20 minutes or so from Martinez's home.

140.     Martinez's assignment to the patch crew constitutes actionable retaliation because it is objectively worse than the maintenance assignment at Delta Lake Park due to the nature of the work itself, which is filthy and hot with no covering from the sun.  The patch crew assignment constituted additional punishment for Martinez due to the increased distance from his wife.

141.     Moreover, it is clear that the patch crew assignment was punishment rather than necessity, as Cuellar had to replace Martinez at the park.  Not surprisingly, Cuellar sent Chicho, an individual who had supported Cuellar's election (including by distributing Cuellar signs), to the park to do the same work Martinez had been doing.  Temporary workforce personnel were also placed at the park, while Martinez was sent to do filthy patch crew work.

**COUNT 1**
**42 U.S.C. § 1983: First Amendment freedom of speech and association**

142.     Plaintiff re-alleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

143.     The Defendants and employees, agents and all those acting in concert with them or at their discretion acting under the color of law of Texas acted with deliberate indifference and subjected each individual Plaintiff to the deprivation of the following rights, privileges and immunities secured by the laws and the Constitution of the United States when they decided to discriminate, retaliate, harass, and terminate or constructively discharge the Plaintiff and deny him the opportunity to access a meaningful job and other benefits free from hostility and politics for which he was qualified and experienced:

144.    The Defendants in their official capacities, and employees, agents and all those acting in concert with them or at their discretion deprived Plaintiff of his right of free speech under the First and Fourteenth Amendments to the U.S. Constitution by basing the decision to retaliate against each individual Plaintiff to an impermissible extent on Plaintiff's exercise of the freedom of political association and/or free speech on matters of public concern. Such retaliatory actions by Defendants were a customary practice and further enforced by policy makers in an arbitrary, capricious, unreasonable, unlawful, unconstitutional and discriminatory manner.

145.    The Defendants and employees, agents and all those acting in concert with them or at their discretion deprived Plaintiff of his right of free speech under the First and Fourteenth Amendments to the U.S. Constitution by basing the decision to take adverse employment actions against Plaintiff to an impermissible extent on Plaintiff's exercise of freedom of association and/or free speech due to his political preferences for candidates opposed to candidates supported by Defendants.

146.    These retaliatory actions by Defendants impermissibly infringe upon Plaintiff's right of political association with groups and candidates of his choice.

147.    Such retaliatory actions by Defendants were a customary practice and further enforced by policy makers in an arbitrary, capricious, unreasonable, unlawful, unconstitutional and discriminatory manner.

148.    Such actions further evidence Defendants' failure to abide by their own substantive and procedural requirements as stated in their policies and rules.  Such actions by Defendants were performed in an arbitrary, capricious, unreasonable, unlawful, unconstitutional and discriminatory manner.

149.    Defendants' actions caused Plaintiff to incur pecuniary damages as well as other foreseeable compensatory damages.  Plaintiff has been subjected to retaliation, harassment, termination, denial of employment, and other adverse actions causing each individual Plaintiff damages.  These damages include lost wages in the past and the future, mental and emotional damages due to mental anguish, humiliation, embarrassment, and other emotional harm and distress.

## Count 2

### 42 U.S.C. 1985(3)

150.    Plaintiff realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

151.    Plaintiff asserts a cause of action against Defendants, in their individual and official capacities, for conspiracy to violate his civil rights. Defendants conspired to illegally commit such acts that caused injury to Plaintiff. Said actions were an attempt by Defendants to accomplish the deprivation of Plaintiff's civil rights of freedom of speech, association.  Defendants were aware of their wrongful acts and benefited or intended to benefit by such actions.

### Injunctive and Declaratory Relief

152.    Plaintiffs are entitled to injunctive, equitable, and declaratory relief, as well as appropriate damages.

153.    Plaintiff prays that the Court enter an order with appropriate injunctive relief requiring defendants, as relevant, to reinstate an individual Plaintiff to his former position of employment, with all benefits and emoluments of his position as he would have received if Defendants' retaliation had not occurred, and further injunctive relief prohibiting any future acts

of retaliation or harassment and making plaintiff whole, as if Defendants' illegal acts of termination had not occurred.

154.    As a proximate result of Defendants' illegal actions, Plaintiff has suffered damages. Plaintiff has suffered and will continue to suffer loss of wages and/or earning capacity. Plaintiff has also suffered mental anguish in the past and will continue to suffer such in the future.

155.    The acts of Defendants set forth in this complaint were committed with malice or reckless indifference to the protected rights of Plaintiff.  In order to punish Defendants for engaging in unlawful retaliation in violation of rights protected under the United States Constitution and to deter defendants from taking such actions in the future, Defendants are liable to Plaintiffs for exemplary damages.

156.    Plaintiffs are also entitled to the maximum amount of pre and post-judgment interest as permitted by law.

157.    As a result of Defendants' illegal actions, Plaintiff has been forced to retain legal counsel.  Plaintiff is entitled to recover all reasonable and necessary attorneys' fees and expenses incurred in preparing and maintaining this action.

### Jury Trial

158.    Plaintiff hereby requests and demands a jury trial.

### Prayer

Plaintiffs pray that upon final judgment, Plaintiff be accorded damages as sough herein, including nominal, compensatory and punitive damages, reasonable and necessary attorneys' fees and expenses and court costs pursuant to 42 U.S.C. 1988 or any other applicable authority, pre-judgment and post-judgment interest, appropriate declaratory and/or injunctive relief, including reinstatement, back and front pay, a prohibition on further acts of retaliation, and for such other

and further relief, both general and special, at law or in equity, to which each individual Plaintiff

shows himself to be justly entitled.

Respectfully submitted,


_____/s/ Jerad Najvar_____
Jerad Wayne Najvar
Texas Bar No. 24068079
4151 Southwest Freeway, Suite 625
Houston, TX 77027
281.404.4696 phone
281.582.4138 fax
jerad@najvarlaw.com
*Attorney in Charge for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on February 17, 2017, the foregoing document was served on the following counsel of record in this matter by the following means:

Rex N. Leach
Atlas, Hall & Rodriguez, LLC
818 West Pecan Boulevard
McAllen, Texas 78501
*Counsel for Defendants*
***via CM/ECF***


/s/ Jerad Najvar_____
Jerad Najvar